## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
## FORT WAYNE DIVISION

THOMAS MITCHELL KLEIN and    )
ANNIE J. RICE,                      )
                                   )
    Plaintiffs,                 )
                                   )
    v.                         )     CAUSE NO.: 1:05-CV-283-TS
                                   )
DEPUY, INC., DEPUY ORTHOPAEDICS, )
INC., and JOHNSON & JOHNSON, INC.,  )
                                 )
    Defendants.                )

### OPINION AND ORDER

The Plaintiffs, Thomas Mitchell Klein and Annie J. Rice, sued the Defendants, Depuy, Inc., Depuy Orthopaedics, Inc., and Johnson & Johnson, Inc., asserting product liability, failure to warn, negligence, negligent and fraudulent misrepresentation, breach of warranties, intentional and negligent infliction of emotional distress, and loss of consortium arising out of Thomas Klein's total hip replacement. The Defendants' prosthesis and component parts were used in Klein's hip replacement surgery. This matter is before the Court on the Defendants' Motion for Summary Judgment as to the Statute of Repose [DE 19].

The resolution of the Motion for Summary Judgment turns on which of two statutes of repose apply to this diversity action: (1) Indiana's ten-year statute of repose; or (2) North Carolina's six-year statute of repose. The Plaintiffs are citizens of North Carolina; Mr. Klein's surgery took place in North Carolina; and the prothesis was manufactured in Indiana. The Defendants argue that North Carolina's six-year statue of repose bars the Plaintiffs' claims. The Plaintiffs argue that Indiana law governs this case and that their claims were filed within its ten-year statute of repose as well as all other statutory limitations. They also assert that even if North

Carolina substantive law applies to their case, their claims are not barred because the North Carolina statute of repose does not apply to their disease-related products liability action.

## BACKGROUND

On August 15, 2005, the Plaintiffs filed their ten-count Complaint against the Defendants alleging that the hip prosthesis manufactured by the Defendants and surgically implanted in Klein was defective and caused injury to the Plaintiffs. Klein claims that the hip prosthesis had a manufacturing or design defect, was marketed without adequate warnings, and was negligently manufactured and designed.  He also alleges that the Defendants negligently misrepresented the product, fraudulently misrepresented the product, breached an implied warranty of merchantability, breached an express warranty of merchantability, and intentionally and negligently inflicted Klein with emotional distress. Plaintiff Rice asserts a claim for loss of consortium.

On October 13, 2005, the Defendants answered and on October 18, they filed an Amended Answer to assert a defense that the Plaintiffs' claims were barred by the applicable statute of repose.

On January 19, 2006, the Defendants moved for summary judgment on the Plaintiffs' claims on the basis that they were not filed within the time provided by North Carolina's six-year statute of repose. On April 21, 2006, the parties filed a joint motion for extension of deadlines because the Plaintiff was scheduled to undergo surgery on his hip, after which he could determine whether he would proceed with his claim that the hip prothesis failed or terminate the litigation. On May 3, the Court granted the motion to extend deadlines. On June 15, 2006, the

Plaintiffs notified the Court of their intention to proceed with their claims and, on June 30, responded to the Motion for Summary Judgment. On July 18, the Defendants replied.

On October 5, 2006, the Court held a conference with the parties' counsel to set a briefing schedule on an issue of law raised by the Defendants' reply: whether the North Carolina Supreme Court would recognize a disease exception to the state's product liability statute of repose. Accordingly, on October 23, the Plaintiffs filed a Sur-Response and, on November 6, the Defendants filed a Sur-Reply.

## STATEMENT OF FACTS

The Plaintiffs are residents and citizens of North Carolina. Defendant Depuy, Inc., is a Delaware Corporation with its principal place of business in Indiana. Depuy is a wholly-owned subsidiary of Johnson & Johnson. Depuy Orthopaedics, in turn, is a wholly owned subsidiary of Depuy. Depuy Orthopaedics is an Indiana corporation with its principal place of business in Warsaw, Indiana, where it manufactures orthopedic and related products.[1]

In 1998, Plaintiff Mitch Klein underwent left hip replacement surgery. The prosthesis used in his surgery was manufactured by Depuy Orthopaedics. Some time later, Klein reported to his orthopedic surgeon, Dr. Jack W. Bowling, Jr., a sensation of instability and severe pain in his left hip. Dr. Bowling diagnosed a failed total hip arthroplasty due to aspectic loosening, asymmetric, polyethylene debris, and osteolysis. On June 9, 2006, Dr.  Bowling performed surgery for revision of the left hip replacement; he removed various components of the hip prosthesis and confirmed his preoperative diagnosis of osteolysis.

---

[1] Hereinafter, the Court will refer to the related entities as "the Defendant."

During the surgery, Dr. Bowling saw about one centimeter of degeneration in Klein's proximal femur, caused by a disease known as osteolysis. Dr. Bowling explains in his affidavit filed in response to the Defendant's Motion for Summary Judgment that osteolysis is a progressive disease commonly seen in conjunction with artificial joint replacement. He states that it is caused by an inflammatory reaction to particulate debris from an artificial joint, especially from polyethylene debris. Dr. Bowling believes that the hymlamer cup liner used in the Plaintiff's hip wore at a faster rate than predicted, causing excessive amounts of polyethylene debris to fall down into Klein's proximal femur area, resulting in osteolysis. Dr. Bowling contends that the osteolysis, in turn, caused the Plaintiff's pain and caused his hip prosthesis to fail.

The Plaintiff received all his medical care in North Carolina where he lives.

## DISCUSSION

### A.    Choice of Law Rules

"A federal court sitting in diversity jurisdiction must apply the substantive law of the state in which it sits," *Land v. Yamaha Motor Corp.*, 272 F.3d 514, 516 (7th Cir. 2001) (citing *Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938) and *Jean v. Dugan*, 20 F.3d 255, 260 (7th Cir. 1994)), including the state's conflict rules, *Land*, 272 F.3d at 516. Accordingly, the Court must apply Indiana's choice of law rules.

In tort cases, Indiana's choice of law analysis involves multiple inquiries. *Simon v. United States*, 805 N.E.2d 798, 804–05 (Ind. 2004). As a preliminary matter, "the court must determine whether the differences between the laws of the states are 'important enough to affect

the outcome of the litigation.'" *Id.* at 805 (citing *Hubbard Mfg. Co., v. Greeson*, 515 N.E.2d 1071, 1073 (Ind. 1987)).  If there is no conflict between the purpose or policy of the laws of the two states, a false conflict exists, and the forum's law applies. *See Lutz v. DeMars*, 559 N.E.2d 1194, 1196 n.1 (Ind. Ct. App. 1990) (citing E. Scoles and P. Hay, Conflict of Laws § 17.32 (1984 ed.)). If such differences do exist, the presumption in Indiana is that the traditional *lex loci delicti* rule applies and that the court will apply the substantive law of "the state where the last event necessary to make an actor liable for the alleged wrong takes place." *Simon*, 805 N.E.2d. at 805 (citing *Hubbard*, 515 N.E.2d at 1073).

> This presumption is not conclusive, however. It may be overcome if the court is persuaded that the place of the tort "bears little connection" to this legal action. If the location of the tort is insignificant to the action, the court should consider other contacts that may be more relevant, such as: 1) the place where the conduct causing the injury occurred; 2) the residence or place of business of the parties; and 3) the place where the relationship is centered. These factors are not an exclusive list nor are they necessarily relevant in every case. All contacts should be evaluated according to their relative importance to the particular issues being litigated. This evaluation ought to focus on the essential elements of the whole cause of action, rather than on the issues one party or the other forecasts will be the most hotly contested given the anticipated proofs.

*Id.*

1.      *Differences between Indiana and North Carolina Law*

The issue to be resolved in this case—whether the action was timely filed—is subject to a conflict between North Carolina's six-year statute of repose and Indiana's ten-year statute of repose. "A statute of repose prevents a plaintiff from bringing an action a certain number of years after the defendant's act or omission, regardless of whether the plaintiff has suffered an injury." *Bryant v. Don Galloway Homes, Inc.*, 556 S.E.2d 597, 600 (N.C. Ct. App. 2001) (citing

*Monson v. Paramount Homes, Inc.*, 515 S.E.2d 445, 449 (1999)); *Jordan v. Talaga*, 532 N.E.2d 1174, 1189 (Ind. Ct. App. 1989) (explaining that a statute of repose "sets a cap on the maximum time limit allowed for the commencement of an action without expanding the regular statute of limitations or reasonable time period for providing notice applicable to the underlying cause of action"). Statutes of repose are intended to be a substantive definition of rights, not merely a procedural limitation on the remedy used to enforce the rights. *Bolick v. Am. Barmag Corp.*, 293 S.E.2d 415, 418–20 (N.C. 1982).

The purpose of Indiana's product liability statute of repose "is to place a temporal limit upon liability for a product's defects." *Stump v. Ind. Equip. Co.*, 601 N.E.2d 398, 401 (Ind. Ct. App. 1992). The Indiana General Assembly imposed a cut-off date after which the manufacturer could not be held liable for defects existing at the time of production in response to the rising costs of insurance that was "fueled by huge increases in the number of product liability claims, large increases in the amounts of settlements and awards, and indications that the victim of an allegedly defective product was favored over the maker of that product in the tort process." *Scalf v. Berkel, Inc.*, 448 N.E.2d 1201, 1204 (Ind. Ct. App. 1983). Indiana set the outer limit at ten years after a product is first delivered to the initial user or consumer. *Dague v. Piper Aircraft Corp.*, 418 N.E.2d 207 (Ind. 1981) (interpreting I.C. § 34-20-3-1). Indiana Code section 34-20-3-1 applies "in any product liability action in which the theory of liability is negligence or strict liability in tort." The statute of repose does not include claims for breach of warranty. *See B & B Paint Corp. v. Shrock Mfg., Inc.*, 568 N.E.2d 1017, 1019–20 (Ind. Ct. App. 1991) (holding that UCC governs breach of warranty claim, which should be treated as contractual claims separate and distinct from a strict products liability cause of action arising out of tortious conduct by the

manufacturer).

The legislative intent of North Carolina's statute of repose applicable to product liability actions was to limit the manufacturer's liability after a certain period of years had elapsed from the date of initial purchase for use or consumption. *Tetterton v. Long Mfg. Co.*, 332 S.E.2d 67, 73–74 (N.C. 1985). That time, in North Carolina, is six years. N.C. Gen. Stat. § 1-50(a)(6). "All product liability claims, regardless of their nature, are subject to this statute." *Nat'l Prop. Investors, VIII v. Shell Oil Co.*, 950 F. Supp. 710, 713 (E.D.N.C. 1996).

Because the Plaintiff's claim would be time-barred by North Carolina's six-year statute of repose, but not by Indiana's ten-year statute of repose, the difference between the period of potential liability expressed in the laws of the two states is important enough to affect the outcome of the litigation.[2] Having determined that a conflict exists, the Court must apply Indiana's choice of law rules, which adhere to a traditional *lex loci delicti* rule.

2. ***The Place of the Wrong***

The Defendant asserts that North Carolina is the location of the tort because the last event necessary to make it liable for the alleged wrong took place in North Carolina. The Plaintiffs, unable to avoid the fact that they suffered their injuries in North Carolina, still argue that Indiana law should apply. They assert that "the location of a tort of this nature should be determined by where the offending act is committed and not simply where the injury is felt." (DE 34 at 4–5.)

---

[2] The Plaintiffs assert that even if North Carolina substantive law applies, their claims are timely because the statute of repose does not apply to disease-related claims and the complaint was filed within the applicable statute of limitations. Whether this assertion is true does not alter the underlying conflict between the two statutes of repose. Neither party has suggested that the choice of law analysis is unnecessary. Moreover, as will be discussed later in this Opinion, this Court does not believe that the North Carolina Supreme Court would apply such a disease exception to this case.

Using this logic, the Plaintiffs argue that the place of the wrong is Indiana because "the offending act was not the surgical implantation of the defective product," or the diagnosis of osteolysis, but the Defendant's "negligent design . . . [and] manufacture of the medical device, the marketing and distribution of the defective product, and negligent and/or fraudulent misrepresentations made regarding the quality of the product." (DE 34 at 5.)

The Plaintiffs' attempt to substitute the place where the offending conduct occurred over the place where the last event necessary to complete the tort transpired is an improper application of Indiana choice of law rules for torts: the Court is permitted to consider the place where the conduct causing the injury occurred only *if it first* determines that the location of the tort is insignificant to the action. *Alli*, 854 N.E.2d at 379 & n.4 (stating that the "other contacts" stage of the choice of law analysis is "reached only after the court has first concluded that the place of the tort is insignificant"); *Simon*, 805 N.E.2d at 805 (explaining that "[i]f the location of the tort is insignificant to the action, the court should consider other contacts that may be more relevant"); *Hubbard*, 515 N.E.2d at 1073 ("In those instances where the place of the tort bears little connection to the legal action, this Court will permit the consideration of other factors such as: 1) the place where the conduct causing the injury occurred."); s*ee also Big Rivers Elec. Corp. v. Gen. Elec. Co.*, 820 F. Supp. 1123, 1125 (S.D. Ind. 1992) (stating that a court will be permitted to evaluate other factors, such as the "place where the conduct causing the injury occurred," when the place of the tort is an insignificant contact). Therefore, the Court must determine the location of the tort, and then determine whether that state's contacts are insignificant to the action, before it can even consider other contacts.

The Plaintiffs offer no legal authority for their argument that the last event necessary to

complete the torts, and therefore the location of the tort in a product liability action, is not the state where the plaintiff suffers injury from the product. In fact, the Plaintiffs' position directly contradicts *Alli v. Eli Lilly and Co.*, 854 N.E.2d 372 (Ind. Ct. App. 2006). In *Alli*, the court held that the last event necessary to complete the torts of strict products liability, misrepresentation, and negligence brought against the manufacturer of antidepressant medication was the injury that occurred when the plaintiff's husband committed suicide. 854 N.E.2d at 378. Here, the last event giving rise to the Plaintiffs' claims based on a product's defects was the injury and physical harm Klein suffered when he developed osteolysis. *See e.g., id.*; *Simon*, 805 N.E.2d at 805 (stating that the last event making the defendant liable for wrongful death occurred when the plane crashed and the decedents died even though the negligent acts occurred prior to the plane crash); *see also Consol. Rail Corp. v.  Allied Corp.*, 882 F.2d 254, 256 (7th Cir. 1989) (noting that "the injury is usually, but now always, the last act necessary to complete the tort").

Thus, North Carolina, as the state where the prosthesis failed and caused injury, is the place where the last event necessary to make the defendant liable for the alleged wrong took place. The next step of the analysis is to determine whether North Carolina's contact is insignificant to the action, thereby permitting the Court to consider other contacts.

### 3.      *Significance of North Carolina's Contacts*

The presumption in favor of applying North Carolina law will be overcome only if its contact is insignificant such that it "bears little connection" to the legal action. *Hubbard*, 515 N.E.2d at 1073–74. "In a large number of cases, the place of the tort will be significant and the place with the most contacts." *Id.* at 1073. It is a rare case where the place of the tort bears little

connection to the legal action. *See, e.g., Simon*, 805 N.E.2d at 806 (holding that the state where a plane crashed was "one of the rare cases in which the place of the tort is insignificant").

The Plaintiffs are hard-pressed to argue that North Carolina's contacts are insignificant and bear little connection to their claims to recover for physical injuries caused by the Defendant's product. This is not a case where the injury "might have occurred anywhere," such as when a plane flies over multiple states during the course of its journey. *Simon*, 805 N.E.2d at 806 (holding that place of a plane crash was insignificant). Rather, the Plaintiff purposefully sought medical treatment in North Carolina, maintained a patient-doctor relationship in North Carolina, and underwent surgery to implant the product at issue in North Carolina.

The Indiana Court of Appeals recent application of Indiana choice of law rules in *Alli* is instructive under these circumstances. In that case, the widow of a patient that committed suicide brought a products liability and wrongful death action against the manufacturer of an antidepressant medication. The defendant was headquartered in Indiana, but the plaintiff's late husband lived, worked, was treated for depression, and committed suicide in Michigan. 845 N.E.2d at 375. After determining that Michigan and Indiana law conflicted and that the suicide was the last event necessary to complete the alleged torts, the court examined Michigan's connection to the legal action. *Id.* at 378–79. The court found that the place of the tort was significant:

> Here, it is undisputed that Daren lived and worked in Michigan. Daren consulted with a Michigan physician and received all of his medical treatment in Michigan. Dr. Chase's decision to prescribe Daren Prozac and Daren's decision to take Prozac occurred in Michigan. The Prozac samples dispensed from Dr. Chase's Michigan office to Daren were provided to Dr. Chase in Michigan by Lilly's Michigan-based sales representatives. Daren took Prozac in Michigan and took his own life there as well.

*Id.* at 379.

Just as in *Ali*, the place of the Plaintiff's injury is significant. The Plaintiff lived in, consulted with doctors, and received all his medical treatment in North Carolina. The doctor's decision to surgically implant the Defendant's product, and the Plaintiff's decision to undergo the surgery, occurred in North Carolina. The product was delivered to North Carolina for the doctor's and the Plaintiff's use there. After the surgery, the Plaintiff continued to live and seek medical care in North Carolina, which is also the place where the prothesis began to fail and where the Plaintiff developed osteolysis.

Moreover, the Seventh Circuit's opinion in *In re Bridgestone/Firestone, Inc.*, 288 F.3d 1012 (7th Cir. 2002), suggests that the place of injury is significant in this case. The Defendants in *In re Bridgeston/Firestone* argued that the place of the plaintiffs' financial injuries bore little connection to their breach of warranty and consumer fraud claims. 288 F.3d at 1016. In considering this argument, the court reflected whether Indiana had ever applied the law of a state where a product was designed, or promotional materials drafted, to a suit arising out of an injury that occurred in Indiana to an Indiana resident. The court found that "[n]either Indiana nor any other state has applied a uniform place-of-the-defendant's-headquarters rule to product-liability cases." *Id.* It held that Indiana's choice of law rule would select the fifty states and multiple territories where the buyers of defective tires lived, and not the place of the seller's headquarters. *Id.* at 1018.

When the Seventh Circuit, and more recently the Indiana Court of Appeals, were given the opportunity to rule that the place of injury was not significant to claims arising out of defective products that were manufactured in another state, they did not do so. This Court,

11

likewise, declines to make such a ruling. The Plaintiffs have not rebutted the presumption in favor of applying the law of North Carolina, as the state where the last event making the Defendant's liable occurred. Therefore, the Court need not determine the existence and relative importance of any other contacts.

**4.       *Public Policy Exception***

In their final attempt to avoid the application of North Carolina substantive law, the Plaintiffs argue that doing so would offend the public policy of Indiana. They contend that North Carolina has given its manufacturers much broader protection than that contemplated by Indiana's more consumer-friendly statute of repose. Because there is nothing "immoral, unnatural, unjust, or prejudicial to the general interests of the citizens of Indiana" about North Carolina's six year statute of repose, the Court will not apply the narrow public policy exception to this case. *Alli* 854 N.E.2d at 380 (declining to apply public policy exception where sister state's laws gave drug manufacturers an absolute defense under certain conditions where Indiana law might permit recovery).

Although Indiana courts need not apply the statutes of another state if to do so would violate the public policy of Indiana, *Schaffert by Schaffert v. Jackson Nat'l Life Ins. Co.*, 687 N.E.2d 230, 234 (Ind. Ct. App. 1997), "[t]his public policy exception is very narrow," *Alli*, 854 N.E.2d at 379–80:

> To justify disregard of another state's laws on public policy grounds, that state's laws "must appear to be against good morals or natural justice or prejudicial to the general interests of the citizens of this State." *Maroon v. State, Dep't of Mental Health*, 411 N.E.2d 404, 411 (Ind. Ct. App. 1980) (quoting *Wabash R. Co. v. Hassett*, 83 N.E. 705 (1908)); *see also Schaffert*, 687 N.E.2d at 234. In *Schaffert*, this court reiterated that "[w]e leave the doctrine to its traditional

12

> application in cases dealing with, inter alia, gaming contracts, lotteries, and
> marriages within the prohibited limits of consanguinity." *Id.* (quoting *Maroon*,
> 411 N.E.2d at 412).

*Alli*, 854 N.E.2d at 379–80 (parallel citation omitted).

Here, not only is the general interest of the citizens of Indiana not at issue (the Plaintiffs are North Carolina residents), but the fact that Indiana's legislative scheme differs from North Carolina's with respect to the time frame in which consumers may sue a manufacturer for product defects, is not sufficient to show that public policy forbids the Court from enforcing North Carolina's laws. *See Alli*, 854 N.E.2d at 380; *Schaffert*, 687 N.E.2d at 234 (both quoting excerpt from Judge Cardoza's opinion in *Loucks v. Std. Oil Co. of N.Y.*, 120 N.E. 198 (1918)). A difference in legislative schemes is not enough to show that public policy forbids enforcement of a foreign right because "[w]e are not so provincial as to say that every solution of a problem is wrong because we deal with it otherwise at home." *Loucks*, 120 N.E. at 201.

Indiana's ten-year statute or repose does not render North Carolina's six-year statute of repose wrong such that application of North Carolina law would offend the public policy of Indiana.


**B.      North Carolina Statute of Repose**

The Plaintiffs filed their suit on August 15, 2005. The product alleged to be defective was surgically implanted in the Plaintiff's left hip over six years earlier in 1998. North Carolina's statute of repose prohibits "any action for the recovery of damages for personal injury . . . based upon or arising out of any alleged defect or failure in relation to a product" that is "brought more than six years after the date of initial purchase for use or consumption." N.C. Gen. Stat. § 1-

50(a)(6).[3]

The Plaintiffs argue that, even if North Carolina law applies to their claims, this six-year statute of repose does not bar Klein's claim for injuries from osteolysis. This argument appears to be supported by the Fourth Circuit's recognition of a disease exception to the statute of repose. For example, in *Hyer v. Pittsburg Corning Corp.*, 790 F.2d 30, 34 (4th Cir. 1986), the court held that N.C. Gen. Stat. § 1-50(6) did not bar the plaintiff's claim for damages for asbestosis even though the product giving rise to the injury was purchased more than six years before the onset of the plaintiff's disease. *See also Guy v. E.I. DuPont de Nemours & Co.*, 792 F.2d 457 (4th Cir. 1986) (holding that the statute of repose did not apply to a claim for chronic obstructive lung disease for exposure to disocynate); *Siver v. Johns-Manville Corp.*, 789 F.2d 1078, 1080 (4th Cir. 1986) (holding that the statute of repose did not apply to an action for wrongful death as a result of disease contracted from exposure to asbestos). The Fourth Circuit has extended this exception beyond occupational diseases. *See Bullard v. Dalkon Shield Claimants Trust*, 74 F.3d 531, 535–37 (4th Cir. 1996) (holding that North Carolina's statute of repose did not apply to the plaintiff's pelvic inflammatory disease, which she alleged was caused by the insertion of a Dalkon Shield intrauterine device).

The *Hyer*, *Guy*, *Silver*, and *Bullard* courts derived their rulings from their understanding of the North Carolina Supreme Court's decision in *Wilder v. Amatex Corp.*, 336 S.E.2d 66 (N.C. 1985), which involved an asbestos-related disease claim against an asbestos manufacturer. What has complicated matters regarding the Fourth Circuit's application of the disease exception recognized in *Wilder* to the product liability statute of repose (§ 1-50(a)(6)) is that the *Wilder*

---

[3] N.C. Gen. Stat. § 1-50(a)(6), as it appears today, was previously § 1-50(6). The Court will use these two citations interchangeably.

decision involved an entirely different statute of repose. In *Wilder*, the court held that N.C. Gen. Stat. § 1-15(b), which was repealed in 1979, did not apply to claims arising out of disease. 336 S.E.2d at 70. The *Wilder* court did not address § 1-50(6).

The Defendant takes issue with the Fourth Circuit's application of *Wilder* and the disease exception to  § 1-50(a)(6). The Defendant contends that the Fourth Circuit's 1986 decision in *Hyer v. Pittsburg Corning Corp.* wrongly predicted that the North Carolina Supreme Court would apply the disease exception to claims that would otherwise be barred by the product liability statute of repose. It submits that when the Fourth Circuit continued to follow this decision in later cases, it did so without reconsideration or elaboration and its prediction is not binding on this Court. The Defendant notes that no North Carolina state court has ever applied the disease exception to the 1979 product liability statute of repose at issue in this case. Rather, the North Carolina case in which the disease exception was first recognized, *Wilder v. Amatex Corp.*, considered the legislative intent behind a 1971 statute that applied to tort actions generally and involved the accrual of personal injury claims. It argues that the accrual statute, which has been repealed and replaced by another statute, is not like the absolute bar found in § 1-50(a)(6). Thus, the reasoning of *Wilder* is not applicable to the absolute bar created by the product liability statute of repose.

In support of its argument, the Defendant points to the language of the statute, which acts as an absolute bar to any action brought six years after the sale of a product, even if the plaintiff has not yet suffered injury. It also argues that North Carolina treats this statute as a substantive part of its product liability laws and construes it broadly to achieve the purposes of the state's Product Liability Act. It contends that the purpose of the Act would be defeated by any disease

15

exception.

1.      *Analysis of the North Carolina Supreme Court's Holding in* **Wilder v. Amatex Corp.**

Because the Fourth Circuit has relied on the decision in *Wilder* as the basis for its

determination that the statute of repose does not apply to claims arising out of disease, this

Court's analysis will also start with *Wilder*.

The statute addressed by the North Carolina Supreme Court in *Wilder* provided:

> Except where otherwise provided by statute, a cause of action, other than one for
> wrongful death or one for malpractice arising out of the performance or failure to
> perform professional services, having as an essential element bodily injury to the
> person or a defect in or damage to property which originated under circumstances
> making the injury, defect or damage not readily apparent to the claimant at the
> time of its origin, is deemed to have accrued at the time the injury was discovered
> by the claimant, or ought reasonably to have been discovered by him, whichever
> event first occurs; provided that in such cases the period shall not exceed ten
> years from the last act of the defendant giving rise to the claim for relief.

N.C. Gen. Stat. § 1-15(b) (Interim Supp. 1976) (repealed 1979). The court noted that the primary

purpose of § 1-15(b) was to change the accrual date from which the period of limitations began

to run "on latent injury claims." 336 S.E.2d at 69 (examining the line of cases that established

"the rule that the statute of limitations in negligence and warranty claims begins to run when the

injury, however slight, is first inflicted, notwithstanding that the injured claimant might then be

justifiably unaware of the injury"). The purpose of § 1-15(b) was to enlarge the time within

which an action for damages could be brought. *Id.* at 70. However, a second, limiting provision

was also included:

> To prevent the statute from subjecting tort feasors to suit for alleged acts or
> defaults so far in the past that evidence as to the event would be difficult to secure
> and intervening causes would be likely, though difficult to prove, the Legislature
> added this proviso: "[p]rovided that *in such cases* the period [i.e., the period

> within which the action may be brought] shall not exceed ten years from the last
> act of the defendant, giving rise to the claim for relief."

*Id.* (brackets in original).

The court reasoned that this last proviso, like the accrual portion of the statute, applied only to latent injury claims. *Id.* ("Expressly, the proviso is limited to 'such cases'" and, therefore, it "applies only to cases in which the bodily injury, . . . for which damages are sought was not readily apparent to the claimant at the time of its origin.") (quoting *Raftery v. Constr. Co.*, 230 S.E.2d 405, 409–10 (N.C. 1976)). This meant that in latent injury cases "the action must be brought within ten years from the wrongful act or default even though the plaintiff did not discover the injury until later." *Id.*

Thus, as it applied in *Wilder,* if the plaintiff's asbestos-related disease was a latent injury, his claim would be barred by the statute of repose contained in § 1-15(b) and he would not be entitled to any relief against the asbestos manufacturer. But this was not the result the court reached; it held that claims based on disease were not latent injury claims because the first identifiable injury occurs when the disease is diagnosed, at which point it is no longer latent. *Id.*

> A disease presents an intrinsically different kind of claim. Diseases such as
> asbestosis, silicosis, and chronic obstructive lung disease normally develop over
> long periods of time after multiple exposures to offending substances which are
> thought to be causative agents. It is impossible to identify any particular exposure
> as the "first injury." Indeed, one or even multiple exposures to an offending
> substance in these kinds of diseases may not constitute an injury. The first
> identifiable injury occurs when the disease is diagnosed as such, and at that time
> it is no longer latent.

*Id.* (noting that the statute was not drafted as a response to cases that involved disease, but to situations where it was possible to identify a single point in time when the plaintiff was first injured, such as those cases involving a fire or a sponge left in a patient's body during surgery).

17

The court stated that an examination of worker's compensation statutes and the North Carolina Supreme Court's interpretation of those statutes demonstrated that the court and the legislature had "long been cognizant of the difference between disease on the one hand and other kinds of injury on the other from the standpoint of identifying legally relevant time periods." *Id.* at 71. It concluded that the legislature, when it considered occupational diseases, "almost always equated the disease's manifestation or its diagnosis as being the 'injury' from which various time periods began to run." *Id.* at 72.

The court reasoned that because the legislature already recognized in 1971,when it drafted § 1-15(b), that exposure to a disease-causing agent was not itself an injury, there was no need for the legislature to treat diseases as latent injury claims for purposes of determining when time periods begin to run. *Id.* at 72 ("That point had already been well established by both the legislature and [the North Carolina Supreme Court] in the occupational disease context as the date of diagnosis."). The Court concluded that the legislature enacted § 1-15(b) to change the accrual date for latent injury claims, and that manifested, diagnosed, diseases are not latent. *Id.* at 73.

The court stated that it was bolstered in its opinion by changes in the bill from its original introduction to its final enactment into law because the original versions specifically referred to disease, but the final enactment omitted all references to claims arising out of disease. *Id.*  The court concluded,

> [i]n light of the statute's purpose, the state of the law when the statute was enacted, and the deliberate omission of reference to disease as this statute made its way through the legislative process, we are satisfied that the legislature intended the statute to have no application to claims arising from disease.

*Id.*

18

2.    *Application of* **Wilder** *to Successor Statutes*

This Court must attempt to predict whether the North Carolina Supreme Court would bar the Plaintiffs' claims under § 1-50(a)(6) or find, as the Plaintiff urges, that diseases are excepted from the statute of repose.[4] Under the reasoning of *Wilder* (the only state court decision to address such an exception), this question turns on what types of claims the statute of repose encompasses. N.C. Gen. Stat. § 1-50(a)(6) states that "no action for recovery of damages for personal injury . . . shall be brought" more than "six years after the date of initial purchase for use or consumption." *Id.* Therefore, if the injury arising from a disease caused by a defective product is a "personal injury," the Plaintiff's claims are barred. If such injuries from diseases are not personal injuries for purposes of the statute, the bar in the statute would not apply to the Plaintiff's claim (assuming that osteolysis is considered a disease). This Court's examination of § 1-50(a)(6) and North Carolina state court decisions leads it to conclude that the North Carolina Supreme Court would not exclude claims arising from disease from the product liability statute of repose.

Section 1-50(6) was enacted in 1979 with Chapter 99B, the Product Liability Act, to deal with claims against manufacturers. *See Colony Hill Condo. I Ass'n v. Colony Co.*, 320 S.E.2d 273, 277 (1984) (finding that "[t]he generality of the language in § 1-50(6) indicates that the legislature intended to cover the multiplicity of claims that can arise out of a defective product"); *Bernick v. Jurden*, 293 S.E.2d 405, 412–13 (N.C. 1982) (stating that § 1-50(6) was enacted with Chapter 99B to cover those actions to which that chapter applies). Chapter 99B applies to "any action brought for or on account of personal injury, death or property damage caused by or

---

[4] There is not provision under North Carolina law that allows a federal district court to certify unsettled questions of state law to the North Carolina Supreme Court for resolution.

resulting from the manufacture, construction, design, formulation, development of standards, preparation, processing, assembly, testing, listing, certifying, warning, instructing, marketing, selling, advertising, packaging or labeling of any product." N.C. Gen. Stat. § 99B-1(3).

The *Wilder* court based its ruling on several factors:

> In light of the statute's purpose, the state of the law when the statute was enacted, and the deliberate omission of reference to disease as this statute made its way through the legislative process, we are satisfied that the legislature intended the statute to have no application to claims arising from disease.

336 S.E.2d at 73. Using these same factors, the Court predicts that the North Carolina Supreme Court would not find that the legislature had the same intentions with regard to § 1-50(a)(6).

First, the two statutes were not enacted for the same purpose. While the purpose of § 1-15(b) was to enlarge the time for plaintiffs who suffered latent injuries to file claims, the purpose of § 1-50(a)(6) was to set an outer limit on manufacturer's liability. An unpublished opinion in *Adams v. A.J. Ballard, Jr. Tire & Oil Co.*, 2006 WL 1875965, *25 (N.C. Super. Ct. June 30, 2006) provides a good synopsis of the legislative intent of § 1-50(a)(6):

> The Supreme Court of North Carolina noted that "the obvious intent of the legislature . . . was to limit . . . manufacturers' [ ] liability after a certain period of years had elapsed from the date of initial purchase for use or consumption." *Tetterton v. Long Mfg. Co.*, 332 S.E.2d 67, 74 (1985). The Court of Appeals found that N.C.G.S. § 1-50(6) "is intended to be a substantive definition of rights which sets a fixed limit after the time of the product's manufacture beyond which the seller will not be held liable. *Davidson v. Volkswagenwerk*, 336 S .E.2d 714, 716 (1985). The Court of Appeals further described the six-year statute of repose by reasoning that "the public policy of this State is to protect North Carolina manufacturers and designers as well as the North Carolina courts from stale claims based on injuries occurring long after the purchase of an allegedly defective product and long after a defendant participated in its manufacture or design." *Boudreau v. Baughman*, 356 S .E.2d 907, 911 (1987), *rev'd in part, modified and aff'd in part*, 368 S.E.2d 849 (1988). "It is apparent from the face of the statute that the North Carolina legislature intended to establish a fixed cut-off date to bar actions brought after six years alleging an injury caused by a manufactured good." *Lindsay v. Public Serv. Co.*, 725 F. Supp. 278, 282

(W.D.N.C. 1989), *appeal dismissed*, 732 F. Supp. 623 (W.D.N.C. 1990).

2006 WL 1875965 at *25 (parallel citations omitted). Section 1-50(a)(6) contains no accrual

language.[5] Nor is it limited to latent injuries, i.e, those that "originated under circumstances

making the injury . . . not readily apparent," § 1-15(b).[6]

Second, the state of the law when the statute was enacted led the *Wilder* court to

conclude that there was no need for the legislature to change the accrual date for diseases

because they were not latent. 336 S.E.2d at 73. Section 1-50(a)(6) does not address latent injuries

or accrual; it is not even a statute of limitations.  Thus, the state of the law regarding when

diseases are considered injuries for accrual purpose is of no relevance. What is relevant is

manufacturers' exposure to stale claims before § 1-50(6) was enacted. The North Carolina

Supreme Court recognized that, in passing § 1-50(6), the legislature made a substantive change

in the conditions precedent to a product liability cause of action. *See Bolick v. Am. Barmag*

*Corp.*, 293 S.E.2d 415, 420 (N.C. 1982) (stating that the legislature has the authority to establish

---

[5] The diagnosis of a disease still begins the accrual period for any statute of limitations. *Dunn v. Pac. Employers Ins. Co.*, 418 S.E.2d 645, 647 (N.C. 1992). However, the diagnosis would not affect the date from which the statute or repose began to run. *See, e.g., Bryant v. Adams*, 448 S.E.2d 832, 835 (N.C. App. 1994) (explaining that statutes of repose differ from ordinary statutes of limitations because they begin to run at a time unrelated to the traditional accrual of a cause of action). "A statute of repose 'serves as an unyielding and absolute barrier that prevents a plaintiff's right of action even before his cause of action may accrue.'" *Id.* (quoting *Black v. Littlejohn*, 325 S.E.2d 469, 475 (N.C. 1985)).

[6] Section 1-50(a)(6) is not even the successor statute to § 1-15(b). A separate statute, N.C. Gen. Stat. § 1-52(16), is the successor statute to § 1-15(b). *Pembee Mfg. v. Cape Fear Constr. Co.*, 329 S.E.2d 350, 353 (N.C. 1985) (stating that § 1-52(16) replaced § 1-15(b)); *Wilder*, 336 S.E.2d at 69 (comparing § 1-15(b) to successor statute § 1-52(16)); *id.* at 74 (stating that many state legislatures' response to a wave of litigation involving delayed manifestation injuries, together with time-delayed product injuries, was to enact statutes like the repealed N.C. Gen. Stat. § 1-15(b) "and its successor" N.C. Gen. Stat. § 1-52(16)) (Myer, J. dissenting). The notes to the current § 1-15 provide, "[f]or provision covering subject matter similar to that of repealed subsection (b) of this section, which related to accrual of causes of action for personal injury . . . in cases other than those covered by subsection (c) of this section [relating to a cause of action for malpractice], *see* G.S. 1-52(16)." Thus, there is no reason to suppose that § 1-50(a)(6) is intended to serve the same purpose.

"a condition precedent to what originally was a common law cause of action"). If a plaintiff's action is not brought within the legislatively-designated time of six years, he "literally has no cause of action." *Tipton & Young Constr. Co. v. Blue Ridge Structure Co.*, 446 S.E.2d 603, 605 (N.C. Ct. App. 1994) (quoting *Rosenberg v. Town of N. Bergen*, 293 A.2d 662, 667 (N.J. 1972)).

For the third factor, the *Wilder* court had the benefit of earlier versions of the statute that included disease. With regard to § 1-50(a)(6), there is no indication that the legislature ever considered making claims arising out of disease an exception to the statute of repose, either through language that was considered and excluded, or by the language that was ultimately enacted.

"The best indicia of legislative intent are the language of the act, the spirit of the act, and what the act seeks to accomplish." *Dunn*, 418 S.E.2d at 648. There is no evidence that the legislature did not intend § 1-50(a)(6) to act as an absolute bar to any product liability action filed "more than six years after the date of initial purchase for use or consumption." N.C. Gen Stat. § 1-50(a)(6). One North Carolina Supreme Court decision that has considered the effect of § 1-15(b)'s successor statute (§ 1-52(16)) on disease claims bolsters this conclusion.

In *Dunn v. Pacific Employers Insurance Co.*, 418 S.E.2d 645 (N.C. 1992), a widow filed a wrongful death action against her husband's employer on a theory of negligence after he died from contracting an occupational disease as a result of exposure to hazardous materials at work. The applicable time periods for bringing an action for wrongful death are set out in N.C. Gen Stat. § 1-53:

> Within two years—
> (4) Actions for damages on account of the death of a person caused by the wrongful act, neglect or fault of another under G.S. 28A-18-2; the cause of action shall not accrue until the date of death. Provided that, whenever the decedent

would have been barred, had he lived, from bringing an action for bodily harm because of the provisions of G.S. 1-15(c) or 1-52(16), no action for his death may be brought.

N.C. Gen Stat. § 1-53(4). N.C. Gen. Stat. § 1-52(16), which replaced § 1-15(b), provides a three year statute of limitations:

Unless otherwise provided by statute, for personal injury or physical damage to claimant's property, the cause of action, except in causes of actions referred to in G.S. 1-15(c), shall not accrue until bodily harm to the claimant or physical damage to his property becomes apparent or ought reasonably to have become apparent to the claimant, whichever event first occurs. Provided that no cause of action shall accrue more than 10 years from the last act or omission of the defendant giving rise to the cause of action.

N.C. Gen. Stat. § 1-52(16). Because the widow brought the action more than three years after her husband was diagnosed with a fatal disease, but within two years of his death, the court's focus was on the proviso regarding § 1-52(16).[7] 418 S.E.2d at 646. After reciting the language of § 1-52(16), the court cited *Wilder* for the proposition that, "[i]n occupational diseases cases, such as the instant case, a cause of action grounded in negligence accrues when the disease is diagnosed." *Id.* at 647 (citing *Wilder*, 336 S.E.2d at 72). The court held that if a claim for injuries had become time-barred under § 1-52(16) during the decedent's life, a claim for wrongful death also becomes time-barred. *Id.* at 648. In the *Dunn* case, § 1-52(16), as applied through the wrongful death statute, did not bar the widow's claim:

In the instant case, decedent's liver cancer was diagnosed on 29 August 1985 following a laparotomy and biopsy at Duke Medical Center. Decedent's bodily injury claim, had he lived, would have accrued on 29 August 1985 and *would have been time-barred three years later under N.C.G.S. § 1-52(16).* Decedent died on 24 June 1987. On that date, his bodily injury claim would not have been time-barred. Thus, this wrongful death claim, having been filed within two years of decedent's death, is not time-barred by any of the provisions of N.C.G.S. §

---

[7] Section 1-15(c), also reference in § 1-53(4), applies to causes of action for malpractice and was not at issue in the *Dunn* case.

23

1-53(4).

*Dunn*, 418 S.E.2d at 648 (emphasis added). In *Dunn*, the North Carolina Supreme Court

explicitly stated that a disease claim would be barred three years after diagnosis under § 1-

52(16). Thus, the statute applies to claims arising out of disease, even though its predecessor, §

1-15(b), did not.

This application of § 1-52(16) is consistent with *Wilder* and with the differences in the

language of § 1-15(b) and § 1-52(16), a difference the *Wilder* court "importantly" noted. 336

S.E.2d at 69. In *Wilder*, the Court stated that § 1-15(b) was "not intended to be a statute of

limitations governing all negligence claims, such as the statute of limitations contained in the

first clause of 1-52(16)." *Id.* Rather, its "primary purpose was to change the accrual date from

which the period of limitations begins to run on latent injury claims." *Id.* In his dissent, Justice

Myers interpreted this reference to mean that § 1-52(16) would not bar claims based on

occupational diseases diagnosed before October 1, 1979, (the effective date of § 1-15(b)'s repeal

and § 1-52(16)'s enactment), but would bar claims based on diagnoses after that date. *Id.* at 75

(concluding that he would vote to hold that § 1-15(b) as written prior to its repeal in 1979 was

applicable to the plaintiff's disease claim and that § 1-52(16) is applicable to all occupational

disease claims in which the diagnosis occurred subsequent to its effective date, "a fact which the

majority seems to concede but does not state.").

The reason the *Wilder* court labeled the difference between the two statutes as an

important one (and why Justice Myers stated that the majority conceded that § 1-52(16) is

applicable to disease claims) became obvious when the court used the fact that § 1-15(b) was

limited to latent injury claims only to hold that the statute did not apply to claims arising out of

disease. This same reasoning cannot apply to the current § 1-52(16), which is not limited to latent injury claims. If the discovery and accrual portions of § 1-52(16) apply to disease claims, such that they can be time-barred three years after being diagnosed, the proviso stating that "no cause of action shall accrue more than 10 years from the last act or omission of the defendant giving rise to the cause of action" also applies. N.C. Gen. Stat. § 1-52(16).[8]

The *Wilder* court did not reference § 1-50(6), even though it was already enacted when it issued its opinion. There is no indication that its holding would apply to § 1-50(a)(6). In fact, to do so would completely ignore the distinction the *Wilder* court made between the statute at issue, which applied only to latent injury claims, and § 1-52(16). It would also contradict the Supreme Court's reasoning in *Dunn* because if § 1-52(16) does not except disease claims, the straight-forward statute of repose found in § 1-50(a)(6) cannot except such claims.[9]

### 3.      *Fourth Circuit Opinions*

The federal courts in North Carolina have held that, like repealed § 1-15(b), § 1-50(6)'s reference to personal injury does not include disease. In *Gardner v. Asbestos Corp., Ltd.*, 634 F. Supp. 609 (W.D.N.C. 1986), an asbestos disease case, the court rejected the defendant's

---

[8] Moreover, the proviso in § 1-15(b) was limited to "in such cases" (referring to latent injury cases) whereas the proviso in § 1-52(16) applies to all causes of action. Thus, the plain language indicates that the statute of repose applies to all causes of action for personal injury even if the first part of the statute was limited to latent injury claims. N.C. Gen. Stat. § 1-52(16) ("Provided that no *cause of action* shall accrue more than ten years from the last act or omission") (emphasis added).

[9] It is not disputed that § 1-50(a)(6), rather than the more general statute of limitations and repose found in § 1-52(16), governs the Plaintiff's claims for damages from a defective product. *See Forsyth Mem'l Hosp., Inc. v. Armstrong World Indus., Inc.*, 444 S.E.2d 423, 447–48 (N.C. 1994) (holding that § 1-52(16) does not apply where a more specific statute governs the cause of action); *Reece v. Homette Corp.*, 429 S.E.2d 768, 769–70 (N.C. Ct. App. 1993) (holding that "[u]nless otherwise provided by statute" clause in § 1-52(16) meant that it did not apply where another statute dealt more directly and specifically with the situation).

argument that *Wilder* had no bearing on the applicability of § 1-50(6) because while § 1-15(b) applied only to latent injury claims, § 1-50(6) applied to all actions for personal injury arising from a defect or failure in relation to a product.

> While it is true as defendants argue that the purpose of Section 1-50(6) is broad in its protection of manufacturers and vendors from the results of long forgotten acts, nothing in the legislative history cited to the Court by defendant gives any indication that the Legislature intended to expand the definition of personal injury beyond that intended in the statute construed in *Wilder*. It appears to this Court that an accurate forecast of the North Carolina Supreme Court's construction of Section 1-50(6) is most plainly instructed by the Court's construction of the earlier statute of repose. That decision makes it plain in the language quoted above that the State Supreme Court does not consider disease to be included within a statute of repose directed at personal injury claims unless the Legislature expressly expands the language to include it.

*Gardner*, 634 F. Supp. at 612. The court did not discuss the latent injury issue or the differences between § 1-15(b), § 1-52(16), and § 1-50(6).

The Fourth Circuit, in *Hyer v. Pittsburg Corning*, 790 F.2d 30 (4th Cir. 1986), also cited *Wilder* as its authority for holding that the North Carolina Supreme Court would hold that § 1-50(6) does not bar a plaintiff's claims for damages for asbestosis even though the product alleged to have caused the injury was purchased more than six years before the onset of the disease. 790 F.2d at 34. After explaining the *Wilder* court's holding, the court cited to the above-quoted language from *Gardner* without further explanation. *Id.*

As noted, these opinions do not actually discuss the latent injury distinction that was the linchpin of the *Wilder* court's decision. The Fourth Circuit decided *Hyer* twenty years ago, shortly after the North Carolina Supreme Court decided *Wilder*. The circuit then continued to follow *Hyer* without reconsideration or elaboration. The court's statement, that the definition of personal injury was not "expressly" expanded to include disease, exposes its misstep. *Wilder*

does not stand for the proposition that "disease" must be expressly included in the definition of injury. The *Wilder* court did not hold that diseases were not injuries; it held that they were not latent injuries. Because an in-depth analysis was not conducted, the narrow application of *Wilder* was missed: diseases are only excluded if a statute is limited to latent injury claims. This led to an inaccurate prediction of how North Carolina state courts would rule on the coverage of the product liability statute of repose. The North Carolina Supreme Court's 1992 decision in *Dunn* confirms that it does not believe that diseases must be specifically and expressly included in a statute of limitations or repose directed at personal injury claims for claims arising out of disease to be included in their coverage.

Although federal courts are bound to state court precedents in interpreting state law, there is no authority that requires a district court that is attempting to predict how the highest state court would rule to follow the decision of federal courts sitting in that state. The Seventh Circuit has said that it will carefully consider the decisions of other circuits, but that it does not defer to them and, in its duty to independently decide cases, may disagree with decisions of other circuits. *Atchison, Topeka and Santa Fe Ry. Co. v. Pena*, 44 F.3d 437, 443 (7th Cir. 1994). Likewise, "[d]istrict courts should not follow other circuits uncritically." *Midwestern Gas Transmission Co. v. McCarty*, 120 F. Supp. 2d 1155, 1173 (S.D. Ind. 2000), *rev'd on other grounds*, 270 F.3d 536 (7th Cir. 2001) (citing *Citizens for a Better Env. v. Steel Co.*, 230 F.3d 923, 927–28 (7th Cir. 2000)).

This Court's consideration of the statutory language and North Carolina state court decisions leads it to conclude that if the North Carolina Supreme Court were faced with the question whether § 1-50(a)(6) applies to personal injury claims arising out of disease, it would

27

answer in the affirmative, finding no exception to the product liability statute of repose.

Because the Defendant's product was implanted in Mitch Klein more than six years before he filed suit, his claim, and Rice's consortium claim, are barred under N.C. Gen. Stat. § 1-50(a)(6).

## CONCLUSION

For the foregoing reasons, the Defendants' Motion for Summary Judgment [DE 19] is GRANTED. Judgment will be entered in favor of the Defendants and against the Plaintiffs.

SO ORDERED on January 31, 2007.

 s/ Theresa L. Springmann
THERESA L. SPRINGMANN
UNITED STATES DISTRICT COURT